Final case of the morning is Mandel v. Thrasher Case No. 17-40059 and we'll hear first from Mr. Rukavina. Good morning. May it please the Court. I have an initial question. Your Honor, yes. This case is about the liquidation of an unsecured claim in bankruptcy, right? Correct. Are there any assets to pay off this claim, whatever it's ultimately liquidated to be? Likely not. However, this claim has been deemed non-discharged. This is a judgment against Mr. Mandel for the rest of his life that will be an in personam and in name judgment. Okay. So there remains a present and continuing issue there with grand jurisdiction. All right. Thank you. Obviously, the Court is prepared with this case, so I'll move right to it and obviously the Court knows that in Mandel 1, most of the issues in this case were adjudicated, although damages were vacated. So let me just cut to the chase. The courts have found Mr. Mandel to be a bad guy. The courts have found that he has committed multiple torts and it is natural for a court, especially a bankruptcy court, I believe, to seek some equitable remedy, some judgment. I know Judge Rose very well. I've been in front of her many times. I've been in front of many bankruptcy courts. I've been in front of this court multiple times on important bankruptcy matters. I've been in front of the Supreme Court on bankruptcy matters. I know how bankruptcy works and thinks. I'm a bankruptcy professor as well. And we tend to look for an equitable result. The problem in this case, Your Honors, is that the bankruptcy court was not sitting as a bankruptcy court. It was not sitting as a court of equity. It was sitting basically in diversity, liquidating state law claims, and is therefore bound by – That is one of the inherent features of what bankruptcy courts do when they adjudicate claims. All the time. Of course. But the only difference is that equity plays no role. Let me just cut to what – You just said you follow the law is what you're trying to say. That's what I'm trying to say. That's a long-winded way to say they have to follow that Texas law on damages. I'm saying that, Your Honor, and I'm also saying implicitly that any judge, I would think, although I'm not a judge, would want to find some recompense for a victim of a torture. Well, let me just tell you, I've read over everything. I'm not going to tell you that I'm an expert over every tittle and jot of this lengthy, lengthy record. However, I understood the mandate of this court to be that the judge needed to go back and state a reasoned explanation for the amounts of damages that she had awarded. That is correct. And the case went back, and she wrote a very, very lengthy explanation for each amount that she awarded. And the district court largely affirmed, the only twist being, I think, attorney's fees or something – or no, the West Nile, not the virus. White Nile, Your Honor. Yes. So, that having been done, I don't see much in your brief that disputes that she did this job. So, I'm not quite sure why you're complaining here unless it's to say your decisions are clear error. Well, that is what I'm saying. And I do want to correct something that you said, Judge Jones. She did not, on remand, explain every award. There were a few that she missed. For example, she never explained why or how she awarded damages for conspiracy to Mr. Coleman. And she said some of them were subsumed within other claims. Exactly. But if what Your Honor is telling me is that she did exactly what ordered, which is to explain her decision, is that really what Mandel 1 was about, just so that she goes and explains? Yep. That's the way I read it. Mandel 1 said, go and explain your decision, bankruptcy court, so that we may assess the merits of your damages award on appeal. And that is, therefore, why we are here today. And if we go through each step, each step where she did explain her award, she did not comply with the second part of Mandel 1, which was you must have a rational relationship to the evidence presented. So, it is not enough that she explain, Your Honor. She must explain it in a legally cognizable way that would allow this court to affirm or, in my humble opinion- And she reconsidered all the evidence and she had what I thought were reasonably good reasons. You take issue with every one of them. Well, Your Honor, let's look at the award of $400,000 to Mr. Coleman for the theft of his intellectual property. The judge, bankruptcy judge, said, remember, the issue is the value of that stolen property. She said, I'm going to award $400,000 because that's how much Mr. Coleman would make for three years of future salary at White Knife. Well, do you do concede that when you're talking about these property IP thefts, you've got a very loose standard of recovery because it's very difficult to measure the damages from appropriated intellectual property? I agree- Not all the law says that. No, Your Honor. That's what Wellogic said and that's what Mandel 1 says. And that's what Texas law says. And I disagree with that. I believe that Texas law very clearly says you must prove these damages with reasonable certainty. And the district court actually agreed with me on that. So certainly, because of the mandate rule, this court is looking at the more loose standard as pronounced in Wellogic's. I disagree with that and I reserve my rights on that. But even under that loose standard, Your Honor, where is the rational or logical way that she say, this piece of intellectual property is worth $400,000 because that's how much Mr. Coleman would make for three years of work. There's no rational connection there. Well, that's a minimum amount. What was the basis for that? That's the point, Your Honor. There is no basis. There is no evidence. If there was evidence in the record that the three years of salary was a disguised payment for intellectual property, fine. There's no expert that says that or anything. Your Honor, there's no expert at all that valued the intellectual property. There are three experts that purported to value White Nile. One that said it was worth $1.85 billion for a company that never made a product, never got any real investments, never generated a dollar of revenue, never generated a dollar of profit. Another expert said White Nile might could be worth a few hundred million dollars in the future. And all the courts said, well, that ain't the test. It's the test of what was it worth when stolen, not in the future. And the third expert said, oh, golly gee, 20% of these companies succeed. I'm going to assume that White Nile would have succeeded. You didn't lose any money in 2000 betting on the internet, betting on the tech industries, did you? Your Honor, I did not. I don't invest in equities. Well, everybody says that there are bubbles in that industry. I find those wildly optimistic, but I do not find them inadmissible. And you're basically saying they were inadmissible. No, I'm not. And she picked the very bottom of the range for everything. I thought what you're saying is that there's no evidence to support linking that amount to that. That's exactly right, Judge Elrod. You're not saying that she picked something that you disagree with. You're saying there's nothing to have picked that from. That's exactly correct, Judge Elrod. Moreover, what I'm saying, it's nuanced, and this is why, again— But Facebook didn't have any profits. Google didn't have any profits for years. And yet they were valued in the billions of dollars because of the kind of— Okay. I mean, that's just the way it is. Okay. And these were reputable experts, were they not? Your Honor, there were three experts, not a single one opined on the value of intellectual property. And the first time around, Judge Rhodes— You're talking about Coleman or West Nile here? Well, Coleman and Thrasher are the ones whose intellectual property was stolen. Right. White Nile has a different damages model. Okay. But recall, Your Honor, that the first time around, the bankruptcy judge and the district court specifically refused to adopt the methodology or the opinion of any of these experts. And this court affirmed that. It was only when we went back that Judge Rhodes started looking at that as a data point. Let me move on now to the award to Coleman for fraudulent inducement into that employment contract. Judge Rhodes awarded him $400,000 for fraudulent inducement into the White Nile employment contract. Again, Texas law could not be clear. You can have damages for fraudulent inducement in an employment contract, but you must liquidate the future value of that contract to present value, and you must deduct, Judge Jones, whatever Mr. Coleman could reasonably earn in the next three years. Again, zero evidence of that. And as I pointed out in my brief, that is their burden of proof. That is their burden to prove that mitigation as part of the elements of their claim. And these flaws were pointed out to the judge. Big time, Your Honor. Both by me prior before in this court and at the remand hearing. And then we go to round off Coleman, $400,000 for conspiracy. Judges, zero discussion of that award. By the rule of mandate one, that conspiracy... Well, it's probably even harder to assess damages for conspiracy than it is for theft of IP. Judge Jones, if you were sitting the first time around, and this was the first panel, your points would... If I was sitting the first time around in the first panel, I would have been shocked by the number of allegations and causes of action that were sustained, and that is why I would have remanded and asked the judge to give reasoned explanation for the damages. And that's what we're... And she was entitled to look at the record, reconsider it anew in light of the guidance of the Fifth Circuit, and come up with reasonable numbers. Okay, so how... So then let's look at her million dollar award to Mr. Thrasher for theft of his intellectual property. Again, intellectual property. What does she do? She looks at a failed state court settlement from 10 years ago between differing parties that happened to be just under a million dollars. Again, between differing parties settling different causes of action, a patently inadmissible... And by the way, the reason why... That's not the fulcrum of that decision. She has about five grounds for the amount of... She does. She does. And I'm going to go through them, Your Honor, but as I pointed out in the record on appeal during the oral argument when she gave her oral ruling, she said that that is the biggest reason. The next reason she looks at is the opinion of Dr. Taylor. Taylor is the one that gave her a range of successful internet companies, and that range is between one million and some high number. But Taylor also said 80% of these companies fail, fail, period. So the reason why she dismissed Taylor's opinion the first time around was because she said, well, Taylor didn't even take into account whether White Nile was or would have been successful before he even got into that range. Now on remand, she... And again, I have unbelievable respect for her, as the panel will know because I've been interviewed about her job. I have utmost respect for her, but now she says, wait, wait, wait. I'm going to look at Taylor. I'm just going to pick the bottom number. A judge cannot be her own expert. A judge... What the judge... If you were a jury, she'd be entitled to do precisely that, as long as the expert evidence was admissible. But it wasn't a jury. Under Daubert. But it wasn't a jury. The first time around... Well, I mean, that didn't seem to... The first time around, Your Honor, the first time around, what Judge Robes said, Judge Robes said, and I agree, damages are very hard here. Damages are fuzzy. So I'm going to pick a number within a range. This court said, you cannot do that, bankruptcy judge. You cannot pick a number within a range, even if it's reasonable. You must have evidence, and your number must be rationally related. The judge, again, what she did... But because that was in the context where she had rejected it all. But then, again, she was entitled to change her mind based on what the court said. But what, Your Honor, there's a mandate rule, and this court issued a mandate that... The mandate did not say that the evidence was inadmissible. The mandate says, we can't understand how she got this number when she rejected the three experts. Agreed. Can I ask a question? Please, Judge. Do you have a follow-up for that? No, please, Judge, please. My question is, is it your position that even if that is in the evidence, the one million to the high number, and we assume that that's actually evidence, even though that would be stricken in any kind of analysis because it's not rationally related to this company or anything specific. But even if you could use that, are you saying that that does not support the award anyway? I am. I am. Even including that in the evidence. I am saying that Judge Rhodes admitted these experts, and I was not the trial lawyer. There was no appeal of that admission, so they're admitted. She's entitled to rely on their credibility. But this court, under the clearly erroneous standard, is entitled to review that credibility. And Judge Rhodes in a district court in the first panel said that expert didn't take into account the 80% of companies that failed. Here we go into the other factors and the other evidence. Again, a failed business plan. Never a real investor. Never a sale. Even when Mandel stole the property and gave it to his new company, Judge Rhodes said that new company almost immediately abandoned any attempt to monetize it. And let me tell you, Your Honor. Mandel collected two and a half million in the meantime, didn't he? No, he did not. That was over the course of many years for many services. All the courts, all the courts have said we cannot look to Mandel's salary for many things he did. I'm not looking at his salary to support the judgment. I'm just saying that it's a fact. You can fail in the tech business and still make money. Let me ask you something, Judge. Because this is something that has always bothered me. Mr. Mandel made a photocopy. I'm sorry. He made a copy of software. And he tried to manipulate it and monetize it. Mr. Coleman and Mr. Thrasher kept that software at all times. Eleven years have gone by, Judge, and they have not made a red penny from that. It doesn't, I mean. It does matter, Your Honor. It does, because it's evidence. If that thing never had a value. Well, the point is, what were the damages when he stole the IP? The damages were the value of the software, the pig, when he stole it. And no matter how much lipstick you put on it, it is still the value of that pig in October when he stole it. And my point is more a logical one, which is that eleven years later, no one has made a penny. What do you want us to do? I want you, Your Honor, to reverse and render a zero or a one dollar. But that would be inconsistent with the mandate of the first opinion, would it not? The mandate vacated all damages. Now, let's talk about attorney's fees. But it said, it didn't have to vacate. It could have reversed and remanded for lack of evidence. But instead it said, we are convinced there must be damages here. And therefore we are remanding for the court to give another explanation. That's exactly right. And now that explanation having been given, where given, because again, in some instances it was not. Now that explanation where given must stand in the day of light before your three honorable judges under the applicable rules of evidentiary review. And I again ask, Your Honor, how can you say that the value of this pen is worth the next three years that I'm going to work as a lawyer? How can you say that the value of the intellectual property stolen in 2006 is based on a failed court settlement from three years later between different parties? How can you say that the value of that property stolen… Well, you've got to make some estimate, and obviously Mr. Mandel must have been pretty stupid if he stole it and knew it had no value, which is what you're arguing now. And that's exactly what turned out to be the case. He was pretty stupid to have stolen it because it had no value to anyone. And sometimes, Your Honor, sometimes that's just a fact. That even a tortfeasor, sometimes a thief steals a box that is empty. It is not good. I'm not asking you to condone what Mr. Mandel did. I'm not asking you to vindicate him. I'm asking, Your Honor, Judge Jones, to look at the evidence in the cold light of day and tell me, in an opinion, how Judge Rhodes' metrics… I don't have to tell you anything. You don't have to. All I have to do is issue, if our panel chooses to, we could issue a judgment affirmed on the district court opinion. You could. You could. But I know that this court looks at it independently. Certainly all three of you are well versed with these issues. I just don't see, as a matter of law, as a matter of logic, as a matter of anything, how one values stolen intellectual property based on these other things. And that's why I tell you I grant that the judge had a difficult time finding a damages model. I grant that courts should be lenient in looking to recompose victims of torts. I grant that. But after all of these years, 11 days of trial, Your Honor, we are going through mental gymnastics instead of having one witness that says the value is X, who's credible, or having one document that closes a transaction that says the value is Y, which is credible. We are having to pick metrics from here and here and here and here and here and here to arrive at a number that is identical to what was arrived at originally where the judge admitted, as she should because she's an honest person, that she picked a number within her range. Let me ask one question. Please, Judge King. On the first appeal here, was the damages appealed at that point? Yes, they were, weren't they? Yes, Your Honor. I appealed both liability and damages. Okay. And did your appeal say there's no evidence supporting the damages? Yes. I attacked the damages on multiple grounds. That was one of those grounds. So you said, round one, no evidence supporting the damages. Absolutely. And we sent it back for her to say what the damages were. Yes. So we obviously looked at the question of no evidence and said, well, we can't get off the hook here, we, whoever we was, we can't get off the hook here on no evidence. It's got to go back. Because no evidence was something that we could have looked at then and should have, apparently, because you raised the issue. So there was enough evidence for something here. In fairness, in Mandel 1, this Court said there is some evidence. Some evidence. All right. That's what the Court said. That has already been decided. That's law of the case. I am not arguing here reverse MSJ. I am arguing that as the bankruptcy court has explained her multimillion-dollar damages reward, she has not done it in a rationally linked-to-the-evidence way as mandated by this Court. And I have a few minutes. Can you give us the amounts, when you come back, of what you would say is the proper reward in this case? $1. Nominal damages. For each of the different causes of action are all entitled? They're all interlinked. They're all subsumed. Texas law says that when a victim cannot prove damages for whatever reason, but he has been a victim, he should receive $1 in nominal damages. Plus attorney's fees. Well, we can argue that. I'm sure you will. Mr. Madden? Thank you, Your Honor. May it please the Court? I would like to just address some of the comments or statements of counsel. We don't need statements of counsel. What we need is, did the Court comply with the mandate of this Court? And, you know, his major argument is that basically all of her conclusions are inconsistent with her findings. Judge, the mandate was clear. It's on page 9 of the book opinion that says, we're sending this back so that you can re-decide it, you can explain it, or review it. And then in the conclusion, it said, you can have a new hearing if you want one or just do an explanation. More importantly, Your Honor was exactly correct, the Court, the prior panel looked at this and said, we see four or five damage theories, and apparently the judge has rejected them all. Actually, in paragraph 93, she only rejected one of them by saying it wasn't helpful, the lost asset theory.  in a second. And they said, since we don't have an opinion that ties cognizable theories of recovery for misappropriation to the evidence, we're going to send it back and let Judge Rhodes try this again. Your Honor, she most certainly did. She most certainly articulated at least three separate bases, including reasonable royalty, the value of benefit to Mandel from his ownership and interest in Nexplorer, and the value of Nexplorer, which was the replacement for White Nile. So she did all of that. Now, Mr. DeVore suggested to this Court that Willogic's is not the law of Texas. Willogic said, look, where you have a situation where you cannot place an exact value with reasonable certainty, it's okay to rely upon inference and an approximation is okay, and the facts must fit the circumstances. Do you think that Willogic's applies or do you think there is a difference? Actually, I think Willogic's is the law of Texas, Your Honor. If there were a difference and Texas was actually more strenuous than Willogic's, which applies in this case? This would be the Texas law and the most recent announcement is Southwest Energy Production Company, 491 Southwest 3rd, 699. It was decided in 16, so it was not available to us back in 2011. Willogic's was not available to Judge Rhodes back in 2011. Southwest says this, each case is controlled by its own peculiar facts and circumstances, and under Heading A, Actual Damages says, in Texas, a flexible and imaginative approach is applied to the calculation of damages in a misappropriation of trade secrets case. That's precisely what Willogic said. Willogic's was a case where you had this IP that the court was trying to value and they based it on the destruction of the value of the company because the company was destroyed. We argued that same damage model originally to Judge Rhodes in 2011 and I'd like to claim a crystal ball but that's exactly the way Willogic's did it and Southwest Energy, the Texas Supreme Court says, that's exactly the way you should do it. So in this case, Judge King, the original appeal because this will provide context for how we get where we are here and a few of the things I'm going to say. There were two appeals of the damages. Mr. Mandel said no liability and zero damages, no evidence of damages having not objected to any of the expert reports, having let all the experts come in without a Daubert challenge and having a valuation by now somebody they say is not a good expert, a fellow by the name of Peter Jackson who was an advisory board member to White Nile known to Rod Martin who came and testified. Mr. Jackson was the chief marketing officer of PayPal. Mr. Rod Martin I don't think they're challenging Mr. Jackson's acumen. These guys were experts in the field and they were also on the management they were the advisory management so the other appeal, Judge King, the other appeal was we said you haven't given us near enough so when you read Judge Rhoad's opinion she doesn't spend any time trying to explain why it's not zero because the court had already told her it's not zero. It reads like why it isn't $50 million because that was our position on remand. Well I'm not sure I interpret that but it just said write more. Well, Judge Jones this flexible and imaginative approach that comes from the US Supreme Court. I don't care what it is my point is simply that she had this wide range of estimates based on the only thing that's troubling is that she flipped her view of the persuasiveness of what they wrote but having done that she was at the very lowest end of their estimates. And I think our precedent, we cite you here from the 60s in Rhoad says in this circumstance under that remand she could re-decide that issue and we cited you a case from Watman a bankruptcy court. He doesn't even challenge that. I mean it is something to figure in in our review. Can we talk about the damages? Sure. Because we're talking in these generalities and I want to talk about the $400,000 damages based upon the salary of $133,000 for three years from a contract that is not valid. May I refer that to Mr. Coleman? And I've got Ok, then let's talk about how this has any value has a million dollar value. Again, unassailed admissible opinion testimony placed it at a range between a million and 56 million. Did it consider that most businesses fail in this field? Well, interestingly enough, you can just look at Judge Rhoad's opinion to see how she was wrong about that because she says while 80% of these internet startups fail, we were just looking at and Brad Taylor only pulled comparables that were search engine companies. There were 22 of them valued at 34 separate instances and they did range in value from a million dollars to $334 million dollars but he narrowed it down to just those that were in the search industry, many of which tried to say they had the same type of technology that ultimately got patented in this case and then he did an analytical approach called Monte Carlo. Now they, Judge Rhoad's, to say why it's not worth 56 million says we had bad executive management, we didn't finish the prototype product there was litigation that ensued and that next floor gave up on the search engine. If you really look at the evidence and the executive management the executive management was Thrasher who thought up the idea Coleman who was helping to promote the idea, Rod Martin of PayPal, Gil Amelio Gil Amelio was the CEO of Apple and the CEO of National Semiconductor he was on our board of the reason that litigation killed White Nile you know how it killed White Nile? After Mandel took the stuff to next floor he got lawyers to represent White Nile to sue Thrasher and Coleman. So the litigation started not with Thrasher and Coleman and Rod Martin Mandel used White Nile the remnants of it to sue them to pin them down. Dr. Amelio said that was what destroyed the value why didn't we have a prototype working? Because of Mandel's tortuous conduct he didn't put in his $300,000 he said he was going to put in all, in other words all of the conduct that Judge Rhodes wants to discount this down to the lowest range was conduct by the tortfeasor and Judge Jones that's why I want to go back to where this flexible approach came from. It came to us from the U.S. Supreme Court in the 20's in Eastman Kodak and it not only adopted the flexible approach with the approximation language but it said why it said because a defendant cannot rely upon uncertainties his tortious conduct creates that came back in story in 1931 it's really prosaic and I'd ask you to read it but the sum and substance of it is to do so, what Judge Rhodes did what Judge Rhodes did is knock us down from $50 million based on uncertainties of the tortious conduct of Mandel and in 1931 the Supreme Court said to do so is a perversion and denial of justice but you know what Judge Jones at the end of the day we didn't re-appeal this because I think you are correct. I don't think it makes a whit of difference that this is a bench trial versus a jury trial. I think that she did what the court asked her to do the first time and as the trier of fact said we didn't meet our burden of persuasion on $50 million you get a million and his reliance upon these uncertainties which the law and the Supreme Court said you ought not to use is absolutely no legal basis to say Judge Rhodes was clearly erroneous and the amount should be zero. Okay. Do you want to talk about the $300,000 person? I thought you were. Real briefly Because that is benefit of the bargain damages. No. Why isn't that benefit of the bargain damages? It's not benefit of the bargain damages. The $300,000 is for the breach of fiduciary duty. The breach of fiduciary duty paragraph 7 of the original order is for taking our intellectual property White Nile's intellectual property and using it to compete against White Nile at Next Floor. The analysis would be identical to the analysis of Thrasher and Coleman the same models, the same measure. Now, did she do that? No, she did not do that. She did not do that because she believed that the White Nile $300,000 wasn't remanded on appeal but if you read her conclusion if you read her conclusion she says you know if I'm wrong about this and Judge Clark says you're wrong it was all remanded and therefore I'm going to increase it by the $197,000 you wanted to increase it for the money they stole the $300,000 had to be based upon the same misappropriation breach of fiduciary duty analysis she'd already made. What are the actual damages that Thrasher incurred as a result of Mandel failing to invest in White Nile? The loss of $50 million worth of IP The actual damages? Those would be those would be the actual damages as calculated by Brad Taylor. I mean that's expectancy damages. $400,000 to pay off a receiver that should have never been necessary The judge said I don't think that it's a good idea to rely on the settlement agreement either because the settlement agreement at that point we would have had clear title to the IP and been able to exploit it. Mr. Rukavina says it's been 11 years and there's been no development. That's because there's still no final judgment saying that the IP is my client's. What did Dr. Emilio say? Dr. Emilio said if you've got litigation, if you don't have clear title, it kills it. And so that's why you should just know that Judge Rhodes would have made the same conclusion about the $300,000. It's been 11 years. It's time to conclude this. I'll leave a minute to Mr. Smith to talk about Mr. Coleman. I don't want to over encourage you Mr. Smith but you actually have 6 minutes. Thank you Your Honor. May it please the court in light of that I'll take just a few minutes at the outset to step back and ask something that Judge Elrod asked that relates to something Judge Jones pointed out. The valuation of this IP was based on comparables that were carefully selected to companies that were similarly situated without products, without granted patents at the nascent infancy stage. They have valuations based on investments. Mr. Taylor used those investments. You know what every one of those companies had? The same risk of failure be it 80% or otherwise that White Nile had. So the risk of failure is necessarily priced into the comparables Mr. Taylor used. No because they didn't price in failing companies. Negative companies. Well actually as a matter of the record Actually as a matter of the record there was testimony in the underlying trial that one of the comparables he used COOL, C-U-I-L actually had subsequently failed. And they asked him does the fact that it subsequently failed change your opinion? And he said no because the task I've been given is to value the right of that IP at the time it was stolen. That's based on what the transactions were at that time. And back to a point Judge Jones made, there were a lot of people that make a lot of money on companies that ultimately fail and transactions take place and money is exchanged on companies that ultimately fail before they fail. And what the court held was a tortfeasor who's wrong is the one who should bear the risk of that IP ultimately failing when he has deprived the defendant, or in this case the person who it's been stolen from of the opportunity to exploit it. He can't drive it into the ground himself and then claim. But you shouldn't get a windfall for something that's never going to be successful when it's now obsolete. Well as a matter of the record there is no record about what has happened with this IP afterwards. There's no subsequent proceedings and for him to speculate that it has no value is outside the scope of what's before the court. So any testimony to that is just misplaced. Can you help me with the $300,000 out of the contract? Was it from that contract or not? From the $400,000 that was awarded for Mr. Coleman I would start by suggesting that we didn't argue that that contract was any basis for his damages. But did she use that as the basis? She appears to have used that, but I think that what Judge Clark correctly pointed out is that he was trying to grapple with a willing buyer, willing seller reasonable royalty. This court found, as did Judge Clark, as did Judge Rhodes, that Mr. Coleman assigned his IP, his work product, and his patents to White Nile pursuant to that consulting agreement. So Mr. Mandel's contention that it bears no relation to the IP is contrary to what this court, the district court, and the bankruptcy court found. He did transfer for that. And what I think Judge Rhodes was getting at, though it's inartfully said in the pleading is that under Mr. Coleman's contract he was to get primarily cash as opposed to an interest in White Nile. If it had been successful, that equity interest would have been worth a whole lot more than it was. But she said what I have on the record in front of me is I know he was getting primarily cash as opposed to Mr. Thrasher. So I'm going to use the cash value. He was to be the chief creative officer and to impart his intellectual property and trade secrets into White Nile. So those were the services to be performed. I think, and still think, that those damages to Mr. Coleman for his IP were worth far more than $400,000, as was supported by the testimony of Taylor and Emilio and Jackson. But like Mr. Madden, I recognize that Judge Rhodes was sitting as a fact finder and entitled to implement her discretion. And in her discretion, she chose to stick to that lower number based on a contract because she had in front of us that Mr. Coleman had been willing to accept that. And what is the appropriate way to get to that number? To get to what number? That Mr. Coleman should have reported? The $400,000. What is the appropriate way to get to that $400,000? Utilizing the testimony of Mr. Taylor about the comparables that were in the same space, applying this court's rationale and logics to how would that be valued, Mr. Coleman was the co-inventor of one of the two patents that issued and was the author of the Sakara documents. So we would posit that something between a 25% and a 50% interest of the IP that reverted back to Coleman and Thrasher would have been the appropriate thing for the court to have done and to base it off of the value of the intellectual property and not off this contract. But we are acknowledging that a willing buyer, a willing seller, she used the contract by which he transferred his rights to that IP to White Nile. I'm trying to get us out of that. If we both agree that that's not an appropriate way to use that, then how do you get to your $400,000 in a legitimate way? With the comparables that Mr. Taylor utilized for the value of the IP, which we had at $56 million, which included risk of cool, which ultimately did fail. It was the current value of that IP at that time and it already prices in the risk of failure. The proper way to get there was pick what the IP number is and then pick an approximation of how you would differentiate that number between Mr. Coleman, White Nile, and Mr. Thrasher as to who should get how much of each of those things. Judge Rhodes did that. She gave Mr. Thrasher a million. She gave White Nile 300,000. She gave Mr. Coleman 400,000. The evidence before the court justifies those numbers based on Mr. Taylor's valuation of the IP and also on the value of Nexplor and the money that Mr. Mandel got out of Nexplor. I'm out of time. Thank you. Very good timing. Thank you. Mr. Riccovino? I'm going to quote directly from Mandel 1. Thrasher and Coleman contend that our recent decision in Willogix supports awarding damages based on the evidence presented at trial. This is incorrect. With due respect, this court has already rejected based on the same evidentiary record that even the flexible Willogix standard has been met. The court said explain why. The court said, I'm quoting, unlike the present case, the trier of fact in Willogix calculated a damages award by crediting the evidence presented at trial. That being a damages expert. And I would rest on the law on page 6 of my reply brief which talks about how in Texas this is reasonable certainty as to damages. But even if we look at Willogix, this court has already said that this record doesn't support it. In Mr. Madden's case from 1931, I'll just note it predates the Erie Doctrine. The Erie Doctrine requires Judge Rhodes to follow Texas law. But this court has already said Willogix is not met. Point two. From paragraph 87 of Judge Rhodes' findings, this is about Brad Taylor and his one to whatever multi-billion dollar range. The court, however, is not persuaded by Taylor's analysis or his expert report. Taylor's calculations of market value fail to adequately account for the extremely high failure rate of companies like White Nile. This is that whole 80%. With due respect to Mr. Smith, the one to whatever range was not somehow factored in for failure or success. It looked at only... Was that a remand opinion? No, that was her original opinion. And it did not change on remand. Now let me quote from paragraph 89 of her original findings. This is regarding the other expert now, Emilio. Interesting. Emilio also recognized that 80% of companies at least like White Nile failed to become profitable, that White Nile's potential would not be bankable for years, and that Emilio would not invest in the company. Also he justified that it might be worth $56 million. So judges, we have a failure of the evidence, and we have a bankruptcy court that suffered and struggled with the evidence seeking a fair result. But here is what Mandel once said. The damages must be the plaintiff's lost profits. Nope. No evidence. The defendant's actual profits from the use of the secret. No evidence. In fact, Judge Rhodes said that an explorer almost immediately abandoned any attempt to exploit this. The value of what a reasonably prudent investor would have paid for the trade secret. No evidence. Because all of the experts were valuing the stock of White Nile, which as you heard included many things, including Coleman's IP. No one tried to value the actual IP that was stolen. Or the development costs the defendant avoided through misappropriation. The defendant never developed this. He stole it and then almost immediately abandoned it for a reasonable royalty. Judges, Mr. Mandel has been found to be a bad guy. He's a young man with children and a wife. His discharge has been denied. He's destitute. Do not penalize him for his torts because of something that is not in the record here. Thank you.